FILED
United States Court of Appeals
Tenth Circuit

**July 22, 2008**

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

JAMES B. McCOY, on behalf of himself, and LORRAY McCOY, Deceased, as heirs of Emily M. McCoy, and as Administrator of the Estate of Emily M. McCoy; AMERICAN NATIONAL PROPERTY & CASUALTY COMPANY,

        Plaintiffs-Appellants,

v.

WHIRLPOOL CORPORATION,

        Defendant-Appellee.

No. 05-3337
(D. C. No. 2:02-CV-2064-KHV)
(D. Kansas)

---

**ORDER**

---

Before **TACHA,** Circuit Judge, **EBEL**, Senior Circuit Judges, and **KANE**, Senior District Judge.*

On December 5, 2007, we issued an order and judgment in this case reversing the

district court's July 29, 2005 Judgment entered in favor of Defendant Whirlpool

---

* The Honorable John L. Kane, Senior District Judge, United States District Court for the District of Colorado, sitting by designation.

Corporation and remanding for entry of judgment in favor of Plaintiffs based on the February 10, 2005 jury verdict. The opinion contained no instructions to the district court concerning an award of post-judgment interest. *See McCoy v. Whirlpool Corp.*, 258 F. App'x 189 (10th Cir. Dec. 5, 2007) (unpublished).

This appeal is presently before the court based on Plaintiffs' motion pursuant to Fed. R. App. P. 37(b) to recall the mandate to include instructions for post-judgment interest, Defendant's reply in opposition, Plaintiffs' reply in support of their motion, and Defendant's response in opposition.

Upon consideration, the motion to recall is **GRANTED**. The mandate issued January 9, 2008 is **RECALLED**.

The December 5, 2007 order and judgment is *amended* to instruct the district court to award post-judgment interest to Plaintiffs from the date of the original judgment entered on July 29, 2005 by the district court.

This order shall act as a supplement to the mandate issued originally by this court on January 9, 2008.

Entered for the Court,

Elisabeth A. Shumaker, Clerk

FILED
**United States Court of Appeals**
**Tenth Circuit**

**December 5, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

JAMES B. McCOY, on behalf of himself,
and LORRAY McCOY, Deceased, as heirs
of Emily M. McCoy, and as Administrator
of the Estate of Emily M. McCoy;
AMERICAN NATIONAL PROPERTY &
CASUALTY COMPANY,

       Plaintiffs-Appellants,

v.

WHIRLPOOL CORPORATION,

       Defendant-Appellee.

No. 05-3337
(D.C. No. 02-CV-02064-KHV)
(D. Kansas)

---

**ORDER AND JUDGMENT**[**]

---

Before **TACHA**, Chief Circuit Judge, **EBEL**, Senior Circuit Judge, and **KANE**, Senior
District Judge.[***]

---

James B. McCoy and American National Property & Casualty Company brought

this action against Whirlpool Corporation for wrongful death and property loss resulting

from a fire at the McCoy home. Following a trial in which the jury returned a verdict for

---

[**] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

[***] The Honorable John L. Kane, Senior District Judge, United States District
Court for the District of Colorado, sitting by designation.

the plaintiffs, the district court entered judgment as a matter of law in favor of the defendant. Plaintiffs appeal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse.

## Background

On the evening of February 16, 2000, Lorray McCoy loaded the dishwasher at her family's home and set its timer to start a wash cycle after a delay of five hours. Mrs. McCoy and her daughter, Shelley, went to bed some hours later. Just as Mrs. McCoy was falling asleep, she smelled smoke and got out of bed to investigate. Mrs. McCoy testified at trial that she discovered flames coming out of the dishwasher and igniting the curtains and wall above it. Mrs. McCoy called to her daughter, but Shelley was unable to escape and died in the fire. The McCoys' home was destroyed.

James B. and Lorray McCoy and their insurer, American National Property and Casualty Company, (collectively "Plaintiffs") filed separate suits against Whirlpool Corporation ("Whirlpool") as the manufacturer of the dishwasher.[1] The suits alleged the fire was caused by a manufacturing defect in the dishwasher and sought damages for wrongful death and property loss based on a strict liability theory. The cases were consolidated and tried to a jury in August, 2003. After the jury deadlocked, the case was retried in early 2005. On February 10, 2005, the jury in the second trial returned a verdict finding for Plaintiffs and awarding them $1,712,914.

---

[1] Mrs. McCoy is now deceased.

2

During the second trial, the district court had taken under advisement oral motions by Whirlpool for directed verdict and judgment as a matter of law. Whirlpool renewed these motions following the verdict. On July 29, 2005, the district court granted Whirlpool's motions and directed that judgment be entered in its favor. The district court based its decision on two findings: (1) the testimony of James T. Martin, one of Plaintiffs' experts, as to general and specific causation was unreliable and hence inadmissible under Rule 702; and (2) with or without Martin's testimony, Plaintiffs had failed to present sufficient evidence to carry their burden of proving that a specific defect in Whirlpool's dishwasher had caused the fire. On appeal, Plaintiffs challenge both findings and the district court's entry of judgment for Whirlpool.

**Discussion**

*I.    Martin's Expert Testimony*

Expert testimony must be both relevant and reliable to be admissible. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 594-95 (1993); Fed. R. Evid. 702. The district court must act as the "gatekeeper" with respect to proffered expert testimony to ensure that it meets both of these requirements. *See Daubert*, 509 U.S. at 589; *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004). This role requires the district court "to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp*, 328 F.3d 1212, 1221 (10th Cir. 2003). We review *de novo* whether the district court performed this "gatekeeper" function and applied the proper

legal standards in doing so. *Dodge*, 328 F.3d at 1223; *see Bitler*, 400 F.3d at 1232. We review for abuse of discretion the procedures utilized by the district court in acting as gatekeeper, and its ultimate determination on whether to admit or exclude expert testimony under the proper legal standard. *Dodge*, 328 F.3d at 1223; *see Bitler*, 400 F.3d at 1232. We will not find abuse of discretion, however, unless we are convinced that the district court's procedures or ultimate determination were "arbitrary, capricious, whimsical, manifestly unreasonable, or clearly erroneous." *Bitler*, 400 F.3d at 1232; *see Dodge*, 328 F.3d at 1223.

In this case, the district court examined Mr. Martin's expert testimony after the trial and determined that his opinions as to general and specific causation, that is, whether the McCoy fire could result from a manufacturing defect and did result from such a defect, were not sufficiently reliable to be admitted under Rule 702. *See McCoy v. Whirlpool Corp.*, 379 F. Supp. 2d 1187, 1196-1202 (D. Kan. 2005). Accordingly, our task is to determine *de novo* whether the district court applied the proper legal standard in making its reliability determination, and, if so, whether this determination and the decision to exclude Martin's testimony were an abuse of discretion.

Martin's expert testimony at trial addressed whether the McCoy fire was caused by a manufacturing defect in the Kenmore New Generation dishwasher in the McCoy home. The New Generation dishwashers, which are manufactured by Whirlpool, contain a door latch switch assembly located at the top center of the dishwasher door. The assembly includes two "microswitches" designed to control electrical current to the dishwasher

4

based on whether the dishwasher door is open or shut. When the dishwasher door is shut and latched, a plunger within each microswitch is mechanically depressed and allows electrical contacts inside the microswitch to touch so that electrical current passes to the dishwasher. In this position, the microswitch is said to be "closed." When the dishwasher door is open and unlatched, the plunger retracts to separate the electrical contacts and automatically turn off the current and hence dishwasher operations. In this position, the microswitch is said to be "open."

Each microswitch also includes two metal tabs that extend outside the microswitch and connect with a flag terminal. Each flag terminal then utilizes a crimp attachment to connect the terminal to conductors in the wiring harness of the dishwasher. The total current demand for the dishwasher passes through the microswitches and connectors when the dishwasher door is closed and the microswitches are in the closed position.

When Whirlpool first began manufacturing the New Generation dishwashers in 1990, it used flag terminals manufactured by AMP in the door latch switch assemblies. Several years later, after experiencing overheating and fire problems at the AMP flag terminals, Whirlpool substituted flag terminals manufactured by ETCO. At approximately the same time that it made this change, Whirlpool also stopped using white microswitches in some New Generation dishwashers and replaced them with black microswitches, which are made of a different material than their white counterparts. This change was not related to overheating problems or safety concerns. The door latch switch

assembly in the McCoy dishwasher, which was manufactured in 1996, had black microswitches and ETCO flag terminals.

Plaintiffs alleged at trial that the McCoy fire resulted from an electrical fire caused by a manufacturing defect in the family's dishwasher, specifically a defect in the electrical circuitry of the door latch switch assembly at either the attachment of the flag terminals to the microswitches or the flag terminals to the wire conductors. In support of these allegations, Plaintiffs presented testimony from four fire origin and causation experts, each of whom investigated the McCoy fire and concluded it originated in the McCoy's dishwasher. Three of Plaintiffs' fire experts further opined that the fire began in the area of the dishwasher's door latch switch assembly and that its cause was electrical in nature. Two of these three described the fire more specifically as resulting from abnormal electricity or an abnormality in the dishwasher's electrical system. Another expert investigated the potential sources of an electrical fire in the McCoy home and testified that the only potential source that he could not eliminate was the dishwasher. This testimony was admitted by the court and is not challenged on appeal.

Plaintiffs also presented the expert opinion testimony of James T. Martin, an electrical engineer with experience in investigating fires involving dishwashers. Mr. Martin's testimony was directed at the mechanism by which an electrical fire could originate in the door latch switch assembly area of the McCoy dishwasher, and whether such a fire would be the result of a manufacturing defect. Mr. Martin testified he formed his opinions based on application of electrical engineering principles and standards to

6

information he gathered through a review of thousands of pages of Whirlpool documents regarding the electrical circuit design of its New Generation dishwashers, the results of Whirlpool testing of these dishwashers, deposition testimony of Whirlpool engineers and Plaintiffs' fire origin and cause experts, and his own inspection of the remains of the McCoy dishwasher and other Whirlpool dishwashers.

Based on this methodology, Mr. Martin testified that in his opinion an electrical fire in the door latch switch assembly area would result from excessive resistance heating occurring at a loose or improper connection in the electrical circuitry of the assembly. He explained that resistance heating has a cumulative or cascading effect because each incident of resistance heating changes the physical properties of the heating point, so that the next incident produces increased heating and higher temperatures. Mr. Martin identified three connection points in the door latch switch assembly at which excessive resistance heating might occur – the connections between the microswitch and flag terminals, between the terminals and conductors, and within the microswitch – but focused on the potential for resistance heating at the attachments of the flag terminals to the microswitch and particularly to the conductor. He testified that an improperly sized or loose crimp in the McCoy dishwasher at these locations was a manufacturing defect that could result in excessive resistance heating, that this excessive resistance heating could over time reach temperatures that would ignite surrounding combustibles, and that he had seen examples of fires caused by this mechanism in dishwashers manufactured by Whirlpool. Mr. Martin also testified that if the McCoy fire originated in an electrical fire

7

in the dishwasher's door latch switch assembly, as Plaintiffs' fire origin and causation experts had testified, then it was his opinion that the specific cause of the McCoy fire was excessive resistance heating occurring in the current flow path caused by a manufacturing defect in the connection between the flag terminal and either the conductor or microswitch.

At trial, Whirlpool argued that Mr. Martin's expert opinion testimony that the McCoy fire could and did result from a manufacturing defect was unreliable and hence inadmissible under Rule 702 because he had not adequately addressed a countering expert opinion presented by Whirlpool engineer Ernest Grunewald. Mr. Grunewald agreed with Mr. Martin that if the McCoy fire originated in the door latch switch assembly area as opined by Plaintiffs' fire science experts, then the cause of the fire was a manufacturing defect in the electrical circuitry in this area.[2] He testified further, however, that in his opinion the McCoy fire could not have originated in this area because the black microswitches in the McCoy dishwasher's door latch switch assembly would have acted as thermal fuses to cut off electricity and thus halt excessive resistance heating in this area before a fire could ignite.[3] Mr. Grunewald based this conclusion on the 160° C

---

[2] Mr. Grunewald testified that something other than a manufacturing defect in the electrical circuitry of the door latch switch assembly, such as improper servicing of this assembly, could cause a fire in this area in some circumstances, but acknowledged that there was no evidence of these circumstances with respect to the McCoy dishwasher.

[3] Both Mr. Grunewald and Mr. Martin testified that a thermal fuse is a device designed to halt the flow of electricity through a circuit when the temperature in the vicinity of the thermal fuse reaches a specific level.

temperature at which he reported the plungers in the black microswitches would melt, which he testified would cause the electrical contacts in the switches to open and stop current flowing through the switches well before resistance heating could produce high enough temperatures to ignite surrounding combustibles. Mr. Grunewald also based his testimony on his personal experience with black microswitches during his long tenure as a Whirlpool engineer.

Mr. Grunewald acknowledged in his testimony that the black microswitches were not designed to serve as thermal fuses and had not been tested or designated as thermal safety devices by the manufacturer or others. He also testified that Whirlpool had reported in testing their New Generation dishwashers that the black microswitches sometimes failed in a closed position (the position that conducts electricity) when the plunger melted in the presence of excessive heat resistance, and that there were instances in which fires had ignited in door latch switch assemblies containing black microswitches. Mr. Grunewald opined, however, that these test and fire reports were either erroneous, based on his physical inspection of the switches in question in connection with this litigation, or otherwise could be explained in a manner consistent with his opinion that a fire could not originate in the door latch switch assembly in the presence of the black microswitches.

In response to Mr. Grunewald's testimony, Mr. Martin testified it would be a totally by-chance event for a microswitch to function as a thermal fuse, that it was not good engineering science to suggest that a switch that had not been designed or tested as

9

thermal fuse in fact reliably functioned as one, that Whirlpool tests had shown that the black microswitches did not always shut off electricity when temperatures reached the plungers' melting point, and that if Plaintiffs' fire and origin experts were correct that the McCoy fire originated as an electrical fire in the door latch switch assembly area of the McCoy's dishwasher, then the black microswitch, by definition, had not functioned as a thermal fuse.

At trial, the district court rejected Whirlpool's challenge to Mr. Martin's testimony and admitted it upon finding that the scientific methodology Mr. Martin had employed in reaching his opinions was customary and generally accepted in the electrical engineering field.[4] Whirlpool's arguments concerning the black switch-thermal fuse theory and Mr. Martin's response to it, the district court found, went only to the weight the jury might accord Mr. Martin's testimony. After trial, however, the district court reversed itself, holding that Mr. Martin's testimony was not sufficiently reliable to be admitted under Rule 702.[5]

The role of the district court in assessing the reliability of an expert's opinion under Rule 702 is simply to determine whether the methodology "employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts

---

[4] In so holding, the district court accepted Mr. Martin's testimony that it was not standard practice in the field, or even possible in many instances, to do physical testing to confirm that a particular defect had caused an electrical fire.

[5] There is no dispute on appeal that Mr. Martin's expert opinion testimony met the other requirements for admission under Rule 702.

which sufficiently satisfy Rule 702's reliability requirements." *Bitler*, 400 F.3d at 1233. Here, there is no question that Mr. Martin, in relying on electrical circuitry information, test results and other materials provided by Whirlpool, as well as his inspection of the McCoy and other Whirlpool dishwashers, based his conclusions on facts satisfying Rule 702's reliability requirements. The district court also found at trial and reiterated in its post-trial decision that the method employed by Mr. Martin in reaching his conclusions about the potential causes of excessive resistance heating in the door latch switch assembly was generally accepted and scientifically reliable. Aplt. App. at 2099; *McCoy*, 379 F. Supp. 2d at 1201. The only basis cited by the district court for nonetheless finding Mr. Martin's methodology insufficiently reliable for admission of his causation opinions was that Mr. Martin had not explained how excessive resistance heating could cause a fire in a New Generation dishwasher equipped with black microswitches. *McCoy*, 379 F. Supp. 2d at 1198-99.

Excluding Mr. Martin's testimony on this basis was an abuse of discretion. The linchpin of the district court's analysis is its acceptance of Mr. Grunewald's opinion testimony that black microswitches always function as thermal fuses. *See, e.g.*, *McCoy*, 379 F. Supp. 2d at 1197 n.14 (describing black microswitches as "thermal protective devices"), 1199 (criticizing Mr. Martin for ignoring "undisputed and known evidence about the thermal properties of black microswitches"), 1201 (holding Mr. Martin's testimony was not sufficiently reliable because it did "not address the thermal protective function that black microswitches perform."). In so doing, the district court necessarily

11

assessed Mr. Grunewald's testimony on this issue and found it credible and persuasive. Such determinations, however, are reserved for the finder of fact, and may not be relied upon by a district court in deciding whether to admit or exclude an opposing expert's conflicting testimony. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005); *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 391 (6th Cir. 2000).

Whirlpool and the district court assert that our decision in *Truck Insurance Exchange v. Magnetek, Inc.*, 360 F.3d 1206 (10th Cir. 2004), is factually on "all fours" with this case and requires exclusion of Mr. Martin's testimony. We disagree. In *Magnetek*, the plaintiff alleged that defective ballast in a fluorescent light fixture had ignited a fire that destroyed the plaintiff's building. It was undisputed that the ballast contained a thermal protective device specifically designed to shut off power to the fixture if the temperature exceeded 232° Fahrenheit, well below the approximately 400° F temperature generally believed necessary to ignite the wood in the fixture's vicinity. *Id.* at 1208. The parties in *Magnetek* further stipulated that the thermal protective device in the ballast functioned properly throughout the fire, meaning that it cut off current to the fixture before the generally accepted ignition temperatures were reached. *Id.* In order to prove causation, therefore, the plaintiff was required to present evidence that ignition could have occurred in the lower temperature range allowed by the thermal protective device. *See id.* at 1209, 1211. The plaintiff produced expert evidence that the ballast could have ignited the fire even at these lower temperatures, but the district court excluded the expert's testimony after determining, based on review of relevant scientific

12

literature, that the scientific theory underlying this low-temperature ignition hypothesis, the theory of pyrolysis, was insufficiently reliable to form the basis of expert testimony. *Id.* at 1211. *See id.* We affirmed on appeal.

In this case, there is no stipulation that the door latch switch assembly contained a thermal protective device of any kind. Nor can it be said that Whirlpool's black switch-thermal fuse theory was undisputed or that Plaintiffs failed to produce sufficiently reliable evidence that the McCoy fire was ignited by the specific manufacturing defect they alleged. Plaintiffs presented evidence, through Mr. Martin, that manufacturing defects in the crimps or connectors in the door latch switch assembly could lead to excessive resistance heating that would reach temperatures high enough to ignite the surrounding plastics. Whirlpool did not challenge the scientific basis of this ignition theory, but rather presented countering evidence, in the form of Mr. Grunewald's black microswitch-thermal fuse testimony, that excessive resistance heating could not have reached ignition temperatures because the black microswitches would cut off the electrical current before these temperatures were reached. Plaintiffs responded by pointing to Whirlpool test results indicating that the black microswitches did not always function as thermal fuses,[6] to evidence that fires had ignited in the door latch switch assembly area of dishwashers

_____

[6] This evidence consisted of both written reports by Whirlpool technicians stating that the microswitches had failed (melted due to excessive resistance heating) in the closed (electricity conducting) position during testing and evidence that several of these dishwashers continued operating through additional cycles even with the melted switches in place, something that could only occur if the switches had failed in the closed position, i.e., were still conducting electricity.

13

containing black microswitches, and to Mr. Martin's testimony that it would be bad engineering science to assume that a device that was not designed to function as a thermal fuse reliably served this function. Although Mr. Grunewald responded with explanations and counter arguments in support of his opinion that the black switches always acted as thermal fuses and would have prevented excessive resistance heating in the door latch switch assembly from starting the McCoy fire, he also testified that he did not know whether the microswitches in the McCoy dishwasher functioned as a *de facto* thermal fuse on the night of the fire. Whether the black microswitch in the door latch switch assembly of the McCoy dishwasher functioned as a thermal fuse that would have prevented ignition was, therefore, very much disputed, and it was the jury's province to decide this issue based on its assessment of the evidence and the credibility of Mr. Martin's and Mr. Grunewald's conflicting testimony.

The district court's reliance on *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878 (10th Cir. 2005), to support its decision was also misplaced. In *Norris*, we found no abuse of discretion in the district court's exclusion of expert witness testimony in part because it completely ignored or discounted without explanation a significant body of scientific research that had concluded there was no reliable basis for finding that the product at issue, silicone breast implants, caused injuries of the type suffered by the plaintiff. *Id.* at 884-86 (experts' testimony "scientifically unreliable because [experts] assume what science has largely shown does not exist – a causal connection between silicone breast implants and disease."). The record here does not demonstrate the existence of a body of

14

established scientific study supporting Whirlpool's contention that the door latch switch assembly in the McCoy dishwasher could not have caused the McCoy fire because of the thermal protective properties of the black microswitches. Mr. Grunewald's opinion in support of this contention is just that, an opinion, and should not have been elevated to the level of established scientific fact.

## II. *Judgment as a Matter of Law*

The district court granted Whirlpool's motion for judgment as a matter of law upon finding that Plaintiffs, even considering Mr. Martin's testimony, had failed to present sufficient evidence for the jury to find that a specific manufacturing defect had caused the McCoy fire. *McCoy*, 379 F. Supp. 2d at 1205. We review *de novo* a district court's disposition of a motion for judgment as a matter of law, applying the same legal standard as the district court. *Snyder v. City of Moab*, 354 F.3d 1179, 1184 (10th Cir. 2003). "Such a judgment is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Id.* We must view the evidence and inferences to be drawn from it in the light most favorable to the non-moving party, *Snyder*, 354 F.3d at 1184, and may not weigh the evidence, judge witness credibility or challenge the factual conclusions of the jury, *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000). In a diversity case such as this, the substantive law of the forum state governs our analysis of the underlying claims, including specification of the applicable standards of proof, but federal law controls the ultimate, procedural question of whether judgment as a matter of law is

15

appropriate. *Haberman v. The Hartford Ins. Group*, 443 F.3d 1257, 1264 (10th Cir. 2006).

Plaintiffs' product liabilities claim is governed by Kansas law.  It provides that a plaintiff must produce proof of three elements to present a prima facie case of strict product liability:  (1) the injury resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; and (3) the condition existed at the time it left the defendant's control.  *Jenkins v. Amchem Products, Inc.*, 886 P.2d 869, 886 (Kan. 1994); *Mays v. Ciba-Geigy Corp.*, 661 P.2d 348, 360 (Kan. 1983).  "For circumstantial evidence to make out a prima facie case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective."  *Mays*, 661 P.2d at 360. "[T]he circumstances shown must justify an inference of probability as distinguished from mere possibility."  *Id.*  The plaintiff is not required, however, "to eliminate all other possibilities, and so prove his case beyond a reasonable doubt.  As on other issues in civil actions, it is enough that he makes out a preponderance of probability.  It is enough that the court cannot say that reasonable men on the jury could not find it more likely than not that the fact is true."  *Id.* at 358 (quoting William L. Prosser, Law of Torts § 102, at 672 (4th ed. 1971)).

The district court vacated the jury verdict in Plaintiffs' favor and entered judgment as a matter of law upon finding that Plaintiffs had failed to present sufficient evidence to prove that a specific defect in the McCoy's Whirlpool dishwasher had caused the fire that

16

injured them.[7]  Reviewing the evidence in the light most favorable to Plaintiffs, and without weighing it or passing on the credibility of the parties' witnesses, we must disagree.

Plaintiffs presented evidence from four fire science experts, Michael J. Schultz, Daniel E. Anderson, Davis L. Yates and James Kuticka, who testified, based on their separate investigations, that the fire originated in the dishwasher in the McCoy house.[8] Three of the four further specified that the fire began in the area of the door latch switch assembly and that it was caused by the electrical system in this area.  Plaintiffs also presented expert testimony from Dr. Byron Wesley Sherman, an electrical engineer, that his investigation of potential electrical causes of the McCoy fire had ruled out all potential causes except the family's dishwasher.

There was additional evidence in the record from both Mr. Grunewald and Mr. Martin that excessive resistance heating in the electrical connections in the door latch switch assembly of Whirlpool's New Generation dishwashers could reach temperatures sufficient to ignite surrounding combustibles, and that such excessive resistance heating would result from a manufacturing defect in the electrical connections in the assembly. There was also evidence that excessive resistance heating in this area had caused fires in

---

[7]  There is no dispute on appeal regarding the sufficiency of Plaintiffs' evidence on the other elements of its claims.

[8]  The testimony and opinions of two of these experts, David L. Yates and Daniel E. Anderson, was entered into the record by stipulation of the parties rather than by live testimony.

New Generation dishwashers that differed from the McCoy's dishwasher only in the type of terminals used in the door latch switch assembly and the material from which the microswitches there were constructed. Plaintiffs further presented evidence, through Mr. Grunewald, that manufacturing defects could and had occurred in crimp connections in assemblies using ETCO terminals, the type present in the McCoy dishwasher, and that fires had actually ignited in the door latch switch assembly area of dishwashers containing the same black microswitches as the McCoy dishwasher. Finally, Plaintiffs presented expert testimony from both Mr. Martin and Mr. Grunewald that if the fire originated in the McCoy dishwasher's door latch switch assembly area as opined by Plaintiffs' fire experts, then it was caused by excessive resistance heating resulting from a defective connection in the electrical circuit in the assembly. Mr. Shultz and Mr. Kuticka, two of Plaintiffs' fire origin experts, concurred that the fire originated in an abnormality in the assembly's electrical circuitry.

Viewing the totality of this evidence in the light most favorable to Plaintiffs, and drawing all reasonable inferences from it in the same light, there was more than sufficient evidence tending to negate other reasonable causes and supporting an inference of a defect in the electrical circuitry of the door latch switch assembly for the jury to infer, as a matter of probability and not mere possibility, that the fire in the McCoy home was caused by a manufacturing defect in the door latch switch assembly of the family's Whirlpool dishwasher. Accordingly, there was sufficient evidence in the record to support the jury's verdict.

18

The district court held otherwise and entered judgment as a matter of law in Whirlpool's favor upon concluding that Plaintiffs had failed to present evidence of a "scientifically plausible cause" of the fire in light of Mr. Grunewald's opinion that the black microswitches in the McCoy dishwasher would have prevented excessive resistance heating in the door latch switch assembly from reaching ignition temperatures. It was not Plaintiffs' burden to disprove Mr. Grunewald's testimony and Whirlpool's defensive theory based on this testimony. "Evidence offered by [the defendant] that is contrary to the evidence offered by the plaintiff creates a question for the jury." *Workman v. AB Electrolux Corp.*, 2005 WL 1896246 *15 (Aug. 8, 2005). As described above, Mr. Grunewald's testimony was disputed, and it was the jury's province to assess Mr. Grunewald's credibility and determine the weight of his testimony. The jury was free to disbelieve Mr. Grunewald's testimony, and it apparently did so.

The district court also erred in reading *Magnetek* as establishing that "evidence that a fire originated at or within a certain product is insufficient by itself to establish that a product defect caused the fire." *McCoy*, 379 F. Supp. 2d at 1204 (citing *Magnetek*, 360 F.3d at 1213). The cited discussion in *Magnetek* does not state this or any other rule regarding the sufficiency of evidence to prove causation. Instead, the question addressed there was whether the expert evidence in question was reliable enough to be admitted under Rule 702. *See* 360 F.3d at 1211-13 (analyzing whether the reasoning and methodology underlying challenged expert testimony was sufficiently reliable for testimony to be admitted). Whether expert evidence is admissible under Rule 702 is a

19

distinct and separate question from whether it and plaintiff's other evidence is sufficient to prove causation or another element of the plaintiff's claim under the governing substantive law. *See, e.g.*, *In re Joint E. & S. Dists. Asbestos Litig.*, 52 F.3d 1124, 1132 (2nd Cir. 1995) (distinguishing between inquiry into admissibility of expert evidence and "[a] sufficiency inquiry, which asks whether the collective weight of a litigant's evidence is adequate to present a jury question."). Maintaining the distinction between a court's reliability determination under Rule 702 and a sufficiency or merits determination is "indeed significant as it preserves the fact finding role of the jury." *In re TMI Litig.*, 193 F.3d 613, 665 n.90 (3rd Cir. 1999).

Plaintiffs also presented sufficient evidence of the manufacturing defect that caused the McCoy fire: a defective connection in the electrical circuitry of the door latch switch assembly of the McCoy dishwasher. Kansas law does not require that the manufacturing defect be specified any more precisely than this. The district court in fact acknowledged as much when it held, in denying Whirlpool's motion for summary judgment, that Plaintiffs' evidence identifying the door latch switch assembly as the defective component of the dishwasher satisfied the legal requirement that they identify the product defect responsible for their injuries. Aplt. App. at 363 (Memorandum and Order at 14, 2003 WL 21554950 *7 (D. Kan. July 8, 2003)).[9]

---

[9] In holding that the plaintiffs presented sufficient evidence of a defect, we are not suggesting that Kansas law requires plaintiffs to prove a *specific* manufacturing defect. *See Mays v. Ciba-Geigy Corp.*, 661 P.2d 348, 360 (Kan. 1983) (holding a plaintiff may prove a manufacturing defect caused the injury by circumstantial evidence that tends to eliminate causes other than a product defect). Rather, we conclude that, even if Kansas

20

The district court's concern that the jury may have speculated that the fire originated in a defective microswitch rather than a defective connection between the flag terminal and the microswitch or the conductor as alleged by Plaintiffs provides no basis for rejecting the jury's verdict in Plaintiffs' favor. Even if this degree of specificity were required by Kansas law, Mr. Martin's testimony and the other evidence cited above, considered in the light most favorable to Plaintiffs, was sufficient for the jury to infer as a matter of probability that the specific defect alleged by Plaintiffs was the cause of the fire.

For the reasons stated above, the judgment of the district court is reversed. This action is remanded to the district court for entry of judgment on the jury's verdict.

Entered for the Court

John L. Kane
Senior District Judge

---

law requires a degree of specificity, the plaintiffs presented sufficient evidence of a manufacturing defect in this case.