#24645-a-DG

**2009 SD 20**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

SUPREME PORK, INC.,                                   Plaintiff and Appellee,

v.

MASTER BLASTER, INC.,                            Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE WILLIAM J. SRSTKA, JR.
Judge

\* \* \* \*

RONALD A. PARSONS, JR.
A. RUSSELL JANKLOW
TAMARA A. WILKA of
Johnson, Heidepriem, Janklow,
  Abdallah & Johnson, LLP
Sioux Falls, South Dakota                      Attorneys for plaintiff
                                                              and appellee.

JAMES W. REDMOND
MARIE H. RUETTGERS of
Heidman Law Firm
Sioux City, Iowa                                     Attorneys for defendant
                                                              and appellant.

\* \* \* \*

ARGUED NOVEMBER 4, 2008

OPINION FILED **04/01/09**

#24645

GILBERTSON, Chief Justice

[¶1.]    Master Blaster, Inc. (Master Blaster) appeals several evidentiary and legal rulings made at the jury trial in which it was found liable for damages caused to Supreme Pork, Inc. (Supreme Pork).  We affirm.

**FACTS**

[¶2.]    In 1999, a small fire broke out in the pressure washer room of Supreme Pork's pig farrowing facility near Lake Benton, MN.  The power washer sustained some damage but was completely repaired.  In restoring the pressure washer room, Supreme Pork contracted with Master Blaster to add and install a second power washer.  It was decided that the power washers' venting system needed to be redesigned and a new chimney installed.  Master Blaster did not perform these services.

[¶3.]    The parties disagree about the details of the subsequent conversation; however, it is undisputed that Master Blaster recommended Pipestone Plumbing and Heating (PP&H) for the venting and chimney work.  Following this discussion, Master Blaster contacted PP&H.  PP&H provided a price quote to Master Blaster.  Master Blaster included the price of PP&H's quote, plus an additional fee, in Master Blaster's quote and bill to Supreme Pork.

[¶4.]    On March 21, 2002, a second fire ignited above the ceiling of the pressure washer room, near the exhaust chimney.  This fire did significant damage to Supreme Pork's facilities.  Fire investigation experts were retained by a number of parties for post-fire causation analysis.

[¶5.]      During the June 2007 trial, several of these experts testified about the cause of the fire and the surrounding circumstances. The trial court permitted testimony regarding: an expert's pretrial preparations made after his deposition; the existence of non-causal building code violations in the chimney installation; the power washer manufacturer's recommendation that a more insulated type of chimney be used; a different fire in 1999 which resulted from PP&H's installation; and, a theory of ignition called "pyrolysis."

[¶6.]      The trial court determined that PP&H served as Master Blaster's subcontractor/agent for this project, which, under Minnesota law,[1] made Master Blaster liable for PP&H's negligence. Master Blaster appeals these rulings.

## ISSUES

1. Whether the trial court erred when it failed to give jury instructions on the issue of agency and independent contractors.

2. Whether the trial court erred when it admitted particular testimony from expert witnesses, in regard to:
   a. Mr. Rallis' testimony regarding the use of Class A vents.
   b. Dr. Schroeder's testimony regarding "undisclosed underlying information."
   c. Mr. Rallis' testimony regarding attic shield "top covers."

3. Whether the trial court erred when it admitted evidence of non-causal code violations on the same project or evidence regarding a 1999 fire at another facility.

4. Whether Dr. Schroeder's testimony regarding "pyrolysis" failed to meet the *Daubert v. Merrell Dow Pharmaceuticals, Inc.* standard.

---

1.     The trial court determined that Minnesota law applies in this case because, among other reasons, the fire occurred in Minnesota.

## ANALYSIS AND DECISION

[¶7.]     **1.     Whether the trial court erred when it failed to give jury instructions on the issue of agency and independent contractors.**

[¶8.]     Both parties concede that PP&H was an independent contractor. After considering the briefs and oral arguments presented by Master Blaster and Supreme Pork on appeal, we find that the issue of "agency" was not an issue in this case.[2] Because agency was not an issue, no jury instruction was required.

[¶9.]     However, the briefs go beyond this initial concern and deal with the issue of vicarious liability. Therefore, it is necessary to expand the discussion beyond a narrow focus on the "agency" issue to the liabilities that arise from independent contractor relationships. The issue on appeal is better phrased as "Whether a primary contractor is liable for its subcontractor's negligence."[3]

[¶10.]     In 1937, the Minnesota Supreme Court held that a boiler company that contracted to manufacture steel plates and attach them to a water tank was not relieved of its duty of care to its customer by delegating work, attaching the plates, to a subcontractor. Instead, the boiler company was liable for the damage caused by

2.     There was no assertion made by either party, either at trial or on appeal, that PP&H was Master Blaster's "employee." Both parties agree that PP&H was an independent subcontractor. Master Blaster's argument that the agent/independent contractor distinction should have been a question for the jury is without merit. This was not in issue at trial; any instruction to this effect would have been unjustified.

3.     As a preface to this analysis, it must be reiterated that the trial court applied the law of the State of Minnesota. The discussion in this section should not be construed as precedent in South Dakota. The choice of law issue was decided prior to trial, and a motion to reconsider was filed and refused. Master Blaster does not appeal the choice of law decision.

the negligence of its subcontractor. *See* Pacific Fire Ins. Co. v. Kenny Boiler & Mfg.

Co*.,* 277 NW 226 (Minn 1937).

[¶11.]    The court explained:

> As a limitation to the doctrine of repondeat superior this court
> has laid down the rule that an employer is not liable for the
> consequences of the negligent acts of an independent contractor.
> . . . But the tendency is to enlarge the operation of the doctrine
> of respondeat superior, and it is a limit which has often been
> exceeded.  Indeed it would be proper to say that the rule is now
> primarily important as a preamble to the catalog of its
> exceptions.
> . . .
> Where one person owes another a contractual duty to act, the
> law imposes upon the person owing that duty the further duty of
> acting with due care in the performance of his contract so as not
> to injure the contractee's person or property.  This duty is
> nondelegable.  That is, the performance of the contract may be
> delegated to another, but this delegation does not relieve the
> contractor of the duty to act, or of his duty to act with due care.
> Consequently defendant is subject to liability for damage
> suffered by the contractee as a result of the negligence of the
> independent subcontractor.

*Id.* at 228 (citations omitted).  This principle survives to this day.  *See* Brasch v.

Wesolowsky, 138 NW2d 619 (Minn 1965); Theissen-Nonnemacher, Inc. v. Dutt, 393

NW2d 397 (MinnCtApp 1986); Federal Ins. Co. v. Westurn Cedar Supply, Inc., 2008

WL 686556 (DMinn March 13, 2008) (Slip copy) (applying Minnesota law).  Under

Minnesota's rule, the principal contractor is liable for the negligence of its

subcontractor.[4]

---

4.    Master Blaster attempts to distinguish this case from Minnesota's precedent
      are unavailing.  Master Blaster argues that it was not a "general contractor"
      for the construction of the facility and, therefore, the rule of *Kenny Boiler* is
      inapplicable.  While many of the cases following the rule of *Kenny Boiler*
      involve general construction contractors and their subcontractors, *Kenny*

(continued . . .)

[¶12.] Master Blaster is vicariously liable for PP&H's negligence through their contractor/sub-contractor relationship. This issue was properly decided by the trial court as a matter of Minnesota law.[5]

[¶13.] **2. Whether the trial court erred when it admitted particular testimony from expert witnesses.**

[¶14.] In *Kaiser v. University Physicians Clinic*, 2006 SD 95, 724 NW2d 186, and *Papke v. Harbert*, 2007 SD 87, 738 NW2d 510, this Court examined the issue of undisclosed expert testimony. The Court recognized that the purpose of pretrial discovery is to allow "the parties to obtain the fullest possible knowledge of the issues and facts before trial." *Papke,* 2007 SD 87, ¶55, 738 NW2d at 529 (quoting *Kaiser,* 2006 SD 95, ¶31, 724 NW2d at 194). To fulfill this purpose, the parties are "under a duty seasonably to supplement [their] response[s] with respect to any question directly addressed to . . . the subject matter on which [the expert witness] is expected to testify, and the substance of [the expert's] testimony." *Kaiser,* ¶32, at 194-95 (quoting SDCL 15-6-26(e)(1)). This is to promote the truth finding process and avoid trial by ambush. *Id.,* ¶34, at 195. Seasonable disclosure allows opposing

---

(. . . continued)
    *Boiler* itself deals with improvements, repairs, and modifications to the pre-existing utilities of a building. The factual distinction does not exist.

5.     At oral arguments, Master Blaster argued that it did not agree to be responsible for PP&H's negligence in the contract. Master Blaster did not raise contract issues at the trial level, nor did it offer jury instructions regarding the contract. This issue is deemed waived. *See* Action Mech., Inc. v. Deadwood Historic Pres. Comm'n, 2002 SD 121, ¶50, 652 NW2d 742, 755 (providing, "[a]n issue not raised at the trial court level cannot be raised for the first time on appeal").

counsel the ability to effectively cross-examine an expert witness at trial. *Id.,* ¶39 - 40, at 197.

[¶15.] "A circuit court's admission of expert testimony falls within its broad discretion and is reviewed under the abuse of discretion standard." *Papke*, 2007 SD 87, ¶13, 738 NW2d at 515. This Court has identified three areas of concern that it considers regarding allegations of undisclosed expert testimony: (1) the time element and whether there was bad faith by the party required to supplement; (2) whether the expert testimony or evidence pertained to a crucial issue; and (3) whether the expert testimony differed substantially from what was disclosed in the discovery process. *Id.,* ¶56, at 529; *Kaiser*, 2006 SD 95 ¶35, 724 NW2d at 195-96.

### a. Mr. Rallis' testimony regarding the use of Class A vents.

[¶16.] During the discovery phase of this case, Supreme Pork asked Master Blaster to produce the installation instruction sheet for the All American brand power washer. These instructions provided the manufacturer's recommendations for how the power washer and the venting were to be installed. A copy of these instructions had been given to PP&H prior to installation.

[¶17.] Master Blaster, the product vendor, repeatedly stated it did not have the instruction sheet in its possession and was unable to provide a copy to Supreme Pork or its experts. A copy of the instruction sheet was discovered in the possession of a Master Blaster expert witness[6] on May 4, 2007, and given to Supreme Pork. Trial commenced June 11, 2007. No depositions were taken of Supreme Pork's

---

6. This witness previously had been hired by All American to investigate this fire. He received the materials from All American.

expert witnesses between the time Supreme Pork received the instruction sheet and the beginning of trial. However, their experts received copies of this newly disclosed information.

[¶18.]     The instruction sheet stated that for "Venting the Machine," the "Class 'A' Double Insulated Chimney is required for a minimum of 500,000 BTU Heat, or a chimney built of [sic] for 500,000 BTU requirements." The power washers installed at Supreme Pork's facility were rated 480,000 BTUs. The instruction sheet was labeled as Exhibit 26[7] and was admitted at trial with no objection by Master Blaster.

[¶19.]     Several witnesses, including Master Blaster's owner, Paul Miersma, and a Supreme Pork expert witness, Chris Rallis, discussed or mentioned the contents of Exhibit 26, the differences between Class A and B vents, and the manufacturer's recommendations. Master Blaster did not object to this testimony.

[¶20.]     Later, Supreme Pork sought to introduce an actual Class A vent into evidence as an exemplar of what was recommended by the pressure washer manufacturer. This was offered as a comparison to the Class B vent used by PP&H, "so the jury can see what did their manufacturer recommend. Mr. Miersma said he gave to the subcontractor these instructions[, Exhibit 26,] and the subcontractor[, PP&H,] disregarded those instructions. . ." The trial court did not allow the Class A vent into evidence on the basis of *Kaiser v. University Physicians Clinic,* 2006 SD 95, 724 NW2d 186. During this discussion, the parties again addressed the late

---

7.     The installation instruction sheet will be referred to as "Exhibit 26" for the remaining discussion.

discovery of Exhibit 26 and the problems this caused for developing deposition testimony from experts regarding Class A vents.

[¶21.]	On the basis of these discussions and these rulings, it is not clear that Rallis' testimony regarding Class A vents rose to the level of the undisclosed expert testimony in *Kaiser* and *Papke*. This testimony was the result of newly acquired evidence, long sought by Supreme Pork and only discovered in the possession of a Master Blaster expert witness approximately one month before trial. The bulk of the discussion of Class A vents is made in response to Master Blaster's questioning. From the transcripts, it does not appear that Master Blaster was taken by surprise or "bushwhacked" by this testimony, as was the concern in *Kaiser* and *Papke*. We cannot conclude this led to an abuse of discretion by the trial court in admitting this testimony.

### b. Dr. Schroeder's testimony regarding "undisclosed underlying information."

[¶22.]	Master Blaster also alleges that Dr. Robert Schroeder's testimony included previously undisclosed underlying information. Master Blaster suggests that statements about Dr. Schroeder's research and experiments concerning the "pyrolysis" theory of ignition were improperly allowed. Further, Master Blaster alleges that Dr. Schroeder's telephone conversation with Dr. Vytenis Babrauskas on the Saturday before trial was inadmissible hearsay evidence.

[¶23.]	Essentially, Master Blaster's arguments question the basis of Dr. Schroeder's opinion. The basis of an expert's opinion is generally a matter going to the *weight* of the testimony rather than the *admissibility*. *See* First Western Bank Wall v. Olsen, 2001 SD 16, 621 NW2d 611. Similarly, some of Master Blaster's

concerns raised on this issue are more appropriately considered with the scientific validity of "pyrolysis," discussed as Issue 4, below. For the purposes of this section, we examine the testimony as a matter of evidence.

[¶24.]    Experts are entitled to rely upon hearsay in forming their opinions when it is the type of information upon which experts in the particular field routinely rely. SDCL 19-15-3.[8] We cannot agree with Master Blaster that a telephone conversation with a leading expert in the field is not "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Master Blaster's hearsay arguments are without merit. Master Blaster's argument suggests that an expert cannot review their work before their trial appearance by discussing their conclusions with colleagues in the field. We cannot accept such a suggestion.

### c.  Mr. Rallis' testimony regarding attic shield "top covers."

[¶25.]    Master Blaster argues that Chris Rallis introduced a new theory of causation at trial. At Rallis' depositions, he posited that the shields[9] used to

---

8.    SDCL 19-15-3 (Rule 703) provides:
      The facts or data in the particular case upon which an expert bases
      an opinion or inference may be those perceived by or made known to
      him at or before the hearing. If of a type reasonably relied upon by
      experts in the particular field in forming opinions or inferences upon
      the subject, the facts or data need not be admissible in evidence.

9.    The attic shields were, in this case, thin pieces of metal rolled into a cylinder
      around the exhaust vent. This created an area of dead space between the
      exhaust vent and the insulation in the ceiling. The shields were made and
      installed by PP&H.

prevent contact between the cellulose insulation[10] and the exhaust vent were insufficiently secured and allowed the insulation to come into proximity with the exhaust vent, leading to the fire.

[¶26.] Rallis' reports, testimony and depositions repeatedly stated his theory that the fire was caused by the insulation getting too close to the exhaust vents. He suggested that the proximity of the insulation and the vent changed at some point. The reason for this change was unknown; however, Rallis hypothesized a number of scenarios, including motion in the attic shield, the shield being tipped over, insulation migration due to air currents, the vent itself moving, etc.

[¶27.] Master Blaster argues that the specific factual scenario, that insulation came over the top of the attic shield because it did not have a top cover, was presented for the first time at trial. Supreme Pork responds that Rallis presented nothing new; the movement of insulation over the top of the shield is logically included in Rallis' general theory of preventing contact.

[¶28.] As with Rallis' previous testimony regarding the Class A vents, discussed above, Rallis' testimony about attic shield top covers came in response to cross-examination. Reading the transcript, the top cover discussion arises from a hypothetical posed to Rallis by Master Blaster's counsel. This hypothetical doubles the depth of the insulation surrounding the attic shields from Rallis' previous assumption. Furthermore, the first suggestion that the shield needs to be covered was made by Master Blaster's counsel.

---

10. Cellulose insulation is treated, shredded newspaper.

[¶29.] Applying the "areas of concern," the timing of this testimony favors

Supreme Pork because it came in response to a direct question from Master Blaster.

Further, there is no evidence of bad faith. While the issue of causation is a central

issue in Supreme Pork's claims, the "over the top of the shield" theory did not

substantially differ from Rallis' or Supreme Pork's central theory. Rallis'

statements were observations and conclusions made about the hypothetical posed to

him by Master Blaster. The manner in which this testimony came to be presented

simply does not support a conclusion that this was previously undisclosed testimony

necessitating reversal. We do not find the admission of the discussion of attic shield

top covers to be an abuse of discretion.

[¶30.] **3. Whether the trial court erred when it admitted evidence of non-causal code violations on the same project and evidence regarding a 1999 fire at another facility.**

> For evidence to be admitted during trial, it first must be found to be relevant. Once the evidence is found to be relevant, it is admissible unless it is specifically excluded. The applicable statute involved in the instant case is SDCL 19-12-5 (FRE 404(b)), which provides:
>
> > Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
>
> Furthermore, this statute is a rule of inclusion. Therefore, if evidence of other acts is relevant, it is admissible for any legitimate purpose other than to prove the character of the defendant. Even if the evidence is relevant and offered for an acceptable purpose, SDCL 19-12-3 (FRE 403) acts as a type of safeguard that allows evidence of other acts to be excluded if its probative value is substantially outweighed by other factors such as unfair prejudice. It is important to remember, however, that because virtually all relevant evidence presented at trial is harmful to the other party, this is not what is meant by unfair

prejudice. To cause unfair prejudice, the evidence must persuade the jury in an *unfair* and *illegitimate* way. As we stated in State v. Steichen:

> Prejudicial evidence is that which has the capacity to persuade the jury by illegitimate means which results in one party having an unfair advantage. Evidence is not prejudicial merely because its legitimate probative force damages the defendant's case. Even though the admission of [other] acts evidence "will usually result in such prejudice, it will not be admitted only if that prejudice is unfair."

> 1998 SD 126, ¶27, 588 NW2d 870, 876. Moreover, admission of the evidence is favored under SDCL 19-12-3, and the *judicial power to exclude such evidence should be used sparingly.*

Novak v. McEldowney, 2002 SD 162, ¶¶10-11, 655 NW2d 909, 913 (citations

omitted) (emphasis added).

> The party objecting to the admission of evidence has the burden of establishing that the trial concerns expressed in Rule 403 substantially outweigh probative value. A trial court's determination to admit other acts evidence will not be overruled absent an abuse of discretion. Upon review we must be careful not to substitute our reasoning for that of the trial court. On review the question is not whether we would have admitted the prior bad acts evidence if we had been the trial judges. Instead, we must ask whether the trial court in the case below abused its discretion by admitting the prior bad acts evidence. Therefore, if the prior bad acts evidence was introduced for any proper purpose, its use is sustainable on appeal.

State v. Mattson, 2005 SD 71, ¶¶20-21, 698 NW2d 538, 546 (citations omitted).

### Code Violations

[¶31.] During trial, the court allowed testimony regarding other building code

violations in the exhaust system.[11] These violations were used to illustrate PP&H's

---

11. The Uniform Mechanical Code requires an eighteen-inch clearance from the junctions of the vent pipe to combustibles. The clearance for the junctions installed by Supreme Pork was only seven and one eighth inches. Both

(continued . . .)

lack of knowledge of building codes and safety requirements, resulting in the generally poor design and quality of workmanship. The trial court allowed Master Blaster to write limiting instructions for the jury explaining that these violations were not to be considered as a cause of the fire. The court read Master Blaster's instructions to the jury.

[¶32.]    Master Blaster argues that this code violation was inadmissible "bad acts" testimony which Supreme Pork introduced to show PP&H's "propensity" for negligent workmanship and its "bad character." This argument is without merit.

[¶33.]    Master Blaster mischaracterizes the code violations as "character evidence." Supreme Pork was not attempting to prove PP&H's "character" or "reputation" with this evidence. Therefore, SDCL 19-12-4 (Rule 404(a))[12] is

---

(. . . continued)
>  parties concede this is a violation of the Code, but not a cause of the fire. Other alleged violations of the Code were deemed cumulative and not admitted into evidence.

12.    SDCL 19-12-4. (Rule 404(a)) provides:

>  Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
>
>  (1)    Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;
>
>  (2)    Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;

(continued . . .)

#24645

inapplicable. The trial court admitted the evidence under SDCL 19-12-5 (Rule 404(b)). The non-causal code violations were relevant, admissible, circumstantial evidence of PP&H's *knowledge* of safety standards at the time of installation, not its *character.*

[¶34.]     The trial court considered Master Blaster's motion to exclude the evidence at the pretrial hearing, and reserved its ruling until trial.[13]  At trial, the motion was denied. While the code violations did not contribute directly to the fire, they have a tendency to show that PP&H did not know of safety requirements on this particular installation. Therefore, this evidence was relevant under SDCL 19-

_____

(. . . continued)

> (3)     Evidence of the character of a witness, as provided
>          in §§ 19-14-8 to 19-14-16, inclusive.

13.     The Order for Motions in Limine provides, in relevant part:

> #6.  The Court reserves its ruling on the Defendant's Motion in Limine to preclude any testimony or mention of non-causal violations of the Uniform Mechanical Code by Plaintiff, its counsel or its witnesses. . .  The Court acknowledges that these violations appear to be classic FRE 403(b) [sic] evidence that should be excluded. However, the Court prefers to make an informed judgment after hearing the evidence and the context in which it is offered. In the event Plaintiff can establish the evidence meets an exception under FRE 404(B). Counsel for Plaintiff must approach and offer the evidence outside the hearing of the jury and receive a ruling on the matter prior to presenting such evidence to the jury.

> #9.  The Court reserves its ruling on Defendant's motion to preclude presentation of evidence, or reference to, a 1999 fire at Pipestone Artificial Breeders, LLC. . . .  Prior to any reference or attempt to present evidence on the matter, Plaintiff's counsel must request a hearing outside the presence of the jury. Plaintiff's counsel must then satisfy the relevancy requirement in FRE 401. . . .  The evidence must also satisfy the requirements of FRE 403, in that its probative value must substantially outweigh the danger of unfair prejudice.

12-1 and obviously satisfied the trial court's concerns regarding SDCL 19-12-3 (Rule 403) and SDCL 19-12-5 (Rule 404(b)) because they were mentioned and discussed in the pretrial motion hearing, in the pretrial order, and during discussions regarding the evidence prior to its introduction.

[¶35.]     There is no indication that this ruling was an abuse of discretion.

### 1999 Pipestone Fire

[¶36.]     In 1999, a fire started in the pig barn of a veterinary clinic in Pipestone, MN.  Investigators determined that the cause of this fire was the improper installation of the vent system for the building's power washer.  This vent system was installed by PP&H.  Chris Rallis, Supreme Pork's expert witness in this case, was hired by PP&H's insurance carrier to investigate the 1999 fire.  He concluded PP&H's actions had caused the fire.  PP&H's president, Doug Dammann, testified that he was informed that PP&H was the cause of this 1999 fire.  It was determined that the cause of the 1999 fire was that proper clearances were not maintained between the escaping heat and combustible materials.  Paul Miersma, Master Blaster's president and owner, explained to the trial court that Dammann had informed him PP&H would be "making certain [its] employees were putting in the vent systems right" before installing the vent system in Supreme Pork's facility.[14]

---

14.   Miersma was aware of the fire at the Pipestone veterinary clinic.  The fire at the veterinary clinic was in February of 1999.  Master Blaster's bid, including the chimney work from PP&H was dated September 1999.

[¶37.] Master Blaster alleges it was unfairly required to litigate the cause of the 1999 fire during the trial. Moreover, Master Blaster argues that this fire occurred at a different time, place and under different causal circumstances. Therefore, it argues, this evidence was inadmissible under SDCL 19-12-1 (Rule 401), -2 (Rule 402), and -5 (Rule 404 (b)).

[¶38.] After considering Master Blaster's motion in limine, the trial court concluded that the cause and timeframe of the Supreme Pork installation was similar enough to warrant inclusion under SDCL 19-12-5 (Rule 404(b)). Like the testimony regarding code violations, this testimony was relevant for purposes other than character. Because of the almost identical nature of the incidents, this testimony was relevant to the foreseeability of harm, the risk of the danger with respect to the lack of safety measures, PP&H's lack of knowledge about installing exhaust chimneys in a manner that maintains the required clearances between combustibles and heat, and Master Blaster's lack of due care in selecting a subcontractor.

[¶39.] Master Blaster concedes "Supreme Pork claimed it proffered the evidence to show PP&H's *lack of knowledge* concerning proper installation methods." (Appellant's Brief, p. 28). Master Blaster has not established that the evidence was not relevant for this purpose or that such knowledge was not relevant to the issues in the case. *See infra* ¶¶46-48.

[¶40.] Evidence of the 1999 fire also establishes that *Master Blaster* knew, at the time it subcontracted PP&H, that PP&H's power washer venting work had been the cause of fires, yet Master Blaster retained PP&H to do the work. Master

Blaster argues that "all that was necessary for Supreme Pork to show in its negligence claim was that '[Master Blaster] and [PP&H] had a duty to use reasonable care under the circumstances to install the flue vents. . . .' Jury Instruction No. 25." This knowledge was, therefore, relevant to the reasonableness of Master Blaster's recommendation to hire PP&H and its eventual subcontracting with them for the installation of flue vents. Because it was relevant for these other purposes, the evidence was admissible under Rule 404(b).

[¶41.]    While this may be a closer call than the code violations, discussed above, we cannot conclude that the trial court abused its discretion.

[¶42.]    Essentially, the dissent implies that the evidence of code violations and the 1999 fire were not admissible on three bases.[15] First, on the basis of SDCL 19-12-1 (Rule 401), the dissent suggests that these two pieces of evidence were irrelevant and, thus, inadmissible under SDCL 19-12-2 (Rule 402). Second, on the basis of SDCL 19-12-5 (Rule 404(b)), the dissent believes this evidence was inadmissible character evidence because it only shows PP&H's propensity to do "sloppy work." Finally, the dissent argues that this evidence was unfairly prejudicial and should have been excluded on the basis of SDCL 19-12-3 (Rule 403). Absent a showing of any *actual prejudice* to Master Blaster and on the basis of the mere *admission* of the evidence itself, the dissent suggests that the case should be remanded for a new trial. The dissent misconstrues the evidentiary rules, misapplies our standard of review, and errs in its conclusions.

---

15.    We summarize and restate the dissent's theories for clarity of discussion.

*Relevance vs. Admissibility*

[¶43.]     "Relevance" and "admissibility" are separate concepts, though our precedent has at times discussed them in a similar manner. This precedent is imprecise. The "relevance" of evidence must be determined before considering whether or not evidence is "admissible." Rule 401 presents the concept of "relevance." SDCL 19-12-1 (Rule 401) provides:

> 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

[¶44.]     After the relevance of evidence is determined, Rule 402 applies the concept of "admissibility" to that determination. "All relevant evidence is *admissible*. . . . Evidence which is not relevant is not *admissible*." SDCL 19-12-2 (emphasis added). Other Rules further condition the "admissibility" of relevant evidence. *See* Rule 403 ("Although *relevant*, evidence may be excluded. . .") (emphasis added); SDCL 19-12-4 (Rule 404(a)) ("Evidence of a person's character . . . is not *admissible* for the purpose of proving that he acted in conformity therewith . . . *except* . . .") (emphasis added); Rule 404(b) ("Evidence of other crimes, wrongs, or acts is not *admissible* to prove the character of a person in order to show that he acted in conformity therewith. It *may*, however, be *admissible* for other purposes . . .") (emphasis added).

[¶45.]     Considered together, these Rules suggest that "relevant" evidence is either "admissible" or "inadmissible," depending on the applicability of the later Rules. However "irrelevant" evidence cannot be "admissible." Our cases have not always been clear on this distinction and occasionally merge these concepts.

*Relevance*

[¶46.]        In its analysis, the dissent applies a particularly narrow interpretation of what evidence was "relevant" in this case.  *See* Dissent, ¶73.  We disagree with the dissent's interpretation of relevant evidence under this Rule.[16]  The dissent suggests that the only evidence that is "relevant" in this case is that which relates to only *one* ultimate fact issue:  the failure to affix attic shields to the attic floor.  *See* Dissent, ¶73.  Quite simply, this narrow view of "relevancy" misinterprets Rule 401.

> Rule 401 uses a lenient standard for relevance.  Any proffered item that would appear to alter the probabilities of a consequential fact is relevant, although it may be excluded because of other factors.  To merely alter the probability of the existence of a fact, or 'make it more probable or less probable,' as the Advisory Committee notes, is not a stringent standard.  Evidence, to be relevant to an inquiry, *need not conclusively prove the ultimate fact in issue*, but only have a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
>
> To be admissible, evidence need only to alter the probabilities of a proposition; it need not sway the balance to any particular degree.  This standard of relevance, adopted by most commentators, revisers and many courts is usually termed 'logical' relevance as opposed to the theory of 'legal' relevance championed by Wigmore, and adopted by some courts prior to the enactment of Rule 401. . .
>
> The standard of logical relevance is more lenient, and permits evidence to be admitted even if it only slightly affects the trier's assessment of the probability of the matter to be proved.  Even though each piece of evidence considered separately is less than conclusive, if when considered collectively with other evidence it tends to establish a *consequential fact*, such evidence is relevant.  For purposes of Rule 401, that is enough.

---

16.    The text of Rule 401 may be found at ¶43, *supra.*

2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 401.04 [2] [c] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2008) (emphasis added).

[¶47.]　　　　Paul Miersma, Master Blaster's president and owner, stated that Master Blaster was required to hire an outside entity to perform the installation of the vent system.  According to Miersma, the law requires that the installation must be performed by a licensed plumber.  Master Blaster sub-contracted with PP&H to perform these skilled services.  PP&H's lack of knowledge of basic code requirements (the safety standards regarding the required clearances between combustibles and heat sources) in performing this installation is an issue of consequential fact that was logically *relevant* to the case.

[¶48.]　　　　Master Blaster was the named defendant in this case; its negligence in hiring and recommending PP&H for the installation was another fact of consequence in the case.  Though the negligent hiring issue was not directly put before the jury, Master Blaster's negligence in regard to the installation was considered by the jury.  *See* Jury Instruction 25, *supra* ¶40.  Master Blaster's knowledge of PP&H's involvement in the 1999 fire was a fact at least logically *relevant* to the theory that *it* was negligent in hiring PP&H for this installation.  We do not find that the trial court's rulings on the *relevance* issues were an abuse of discretion.

*Admissibility*

[¶49.]　　　　As recognized by the trial court, the relevance determination was not sufficient by itself to prove *admissibility,* in this case.  The trial court considered Master Blaster's arguments regarding Rules 404(b) and 403 regarding "other acts"

and "prejudice."[17]  The trial court reserved its rulings on these issues until trial.

Ultimately, the trial court admitted the evidence at trial.

_____

17.     The dissent incorrectly states, "the trial court never performed any balancing analysis on this evidence.  It simply concluded that because the evidence was relevant, it was admissible."  Dissent, ¶76.  This evidence was considered and discussed at length in a pretrial motions hearing, and during the trial both on and off the record.

At the pretrial motions hearing, the parties and the trial court discussed the admissibility of the eighteen-inch clearance code violation.  The discussion clearly indicates discussion of Rule 403 issues including the "highly prejudicial" nature of the evidence (Pretrial Motions, p. 30) and "confusion to the jury" (Pretrial Motions, p. 36).  Rule 403 is directly referenced by the trial court in this discussion (Pretrial Motions, p. 36).  The trial court reserved its ruling on the admissibility of this evidence until trial.  *See supra* ¶34 n 13.

Similarly, during this same pretrial motion hearing, the admissibility of the 1999 fire was discussed by the parties and considered by the trial court.  Master Blaster's motion in limine stated:

> 13.  Doug Dammann[, PP&H's president,] testified that a previous fire at the Pipestone Artificial Breeders, LLC, in 1999 was alleged to have been caused by faulty venting of a power washer. . . .
>
> 14.  Admission of evidence of the 1999 Pipestone fire and the fact that it allegedly started in the power washer room and may have been caused by faulty chimney venting would *unfairly prejudice* Master Blaster at trial.

(Emphasis added.)  In considering this motion, the trial court stated, "[the 1999 fire is] probably going to be relevant and it's probability [sic] going to be . . . substantially more probative than prejudicial."  (Pretrial Motions, p. 48); "I can see where this is going to be a troublesome bit of evidence."  (Pretrial Motions, p. 49); and "under Rule 401 . . . it's going to aid the jury and it's going to establish . . . the existence of a fact, the fact you're trying to establish negligence – negligence [sic] construction and its going to make it more probably than not and the 403 provision is coming in and so it's going to be more troublesome."  After hearing from both parties, the trial court reserved its ruling until trial.  *See supra* ¶34 n 13.

On the third day of trial, the trial court stated, in regard to the code violation:

(continued . . .)

Rule 404(b) – Other Acts

[¶50.]     The dissent suggests evidence of the code violations and the 1999 fire

*only* prove PP&H's or Master Blaster's character; therefore, it should be

inadmissible under Rule 404(b).  Rule 404(b) provides:

> Evidence of other . . . acts is not admissible to prove the
> character of a person in order to show that he acted in
> conformity therewith.  It *may*, however, be admissible for other
> purposes. . .

(Emphasis added.)

[¶51.]     Rule 404(b) does not require the exclusion of other acts evidence in all

circumstances.  If the evidence is used *only* "to prove the character of a person" to

show that person's propensity to do similar acts, it is not admissible.  As the Rule

clearly states, this same evidence *is admissible* for other purposes, such as

_____

(. . . continued)

> Well, it's relevant but . . . it's going to have a tendency to introduce a
> new issue in here.  I want to limit it down . . . I think it's relevant, it's
> probative, but under 403 it has some problems and I need to figure out
> a limiting instruction to limit it down. . . .

In direct response, counsel for Master Blaster stated:

> Well, if there is going to be a limiting instruction – and we're not
> agreeing that it should be allowed, in any event, *because we're
> already now talking about a second fire that's unrelated to this
> one.*  I would say that the limiting instruction at the very least
> has got to say the plaintiff concedes that the 18 inches did not
> have anything to do with the cause of the fire. . .

(Emphasis added.)  The limiting instruction was then written by Master
Blaster's counsel.  Master Blaster's limiting instruction was read to the jury
*twice* during the third day of trial.  In addition, off the record conversations
were held during trial regarding this evidence, just prior to presenting the
evidence to the jury.

knowledge, identity, etc. As discussed above in the relevance discussion, *supra* ¶¶46-48, the evidence of the code violations and the 1999 fire have purposes other than to prove that PP&H's work has a propensity to start fires.

[¶52.]     The dissent's error on this issue appears to stem from its narrow interpretation of "relevance" and applying this narrow interpretation to the "other purposes" of character evidence. *See* Dissent, ¶75.[18]  Under the dissent's theory, consequential facts that are not direct evidence of the ultimate factual issue (the placement of attic shields) have no relevant purpose whatsoever.  The dissent's approach considers these "other purposes" *irrelevant,* rather than inadmissible. This error is a result of the confusion of relevance and admissibility.

[¶53.]     The trial court's admission of this evidence on the basis of Rule 404(b) was not an abuse of discretion.

Rule 403 – Prejudicial Evidence

[¶54.]     In relevant part, SDCL 19-12-3 (Rule 403) states:  "evidence may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice. . . ."

[¶55.]     Rule 403 is not simply a "more than, less than" comparison; the test is whether the probative value is *substantially* outweighed by the danger of unfair

---

18.   "Similarly, the evidence regarding the 1999 fire was not relevant to the instant action. . .  The cause of the 1999 fire was not related to a failure to affix shields to the floor around the chimney vent.  . . .The facts surrounding the 1999 fire could not assist the trier of fact in determining whether the cause of the instant fire was as theorized by Supreme Pork.  Although the cause of the 1999 fire was not in dispute, the cause of the current fire certainly was. . . .  [Therefore], the evidence relating to the 1999 fire was also irrelevant to the case and should not have been admitted."  Dissent, ¶75.

prejudice. "Once the evidence is found relevant, however, the balance tips emphatically in favor of admission unless the dangers set out in Rule 403 'substantially' outweigh probative value." State v. Wright, 1999 SD 50, ¶14, 593 NW2d 792, 799 (citing Edward J. Imwinkelried, Uncharged Misconduct Evidence § 8.28, at 118-19 (Rev. ed. 1998)).

[¶56.]    Furthermore, the Rule 403 test requires us to consider the probative value as the basis and measure the danger of prejudice *against* that probative value; not the other way around. While this distinction is subtle, the proper formulation reflects the burdens imposed by the Rule. The probative value is not required to "measure up" to the prejudicial value. Quite the opposite is true; the prejudicial value must be shown to substantially outweigh the probative value. "The party *objecting* to the admission of evidence *has the burden* of establishing that the trial concerns expressed in Rule 403 substantially outweigh probative value." *Mattson,* 2005 SD 71, ¶20, 698 NW2d at 546 (emphasis added).

[¶57.]    Applying the abuse of discretion standard of review, we do not believe the trial court committed "'a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *Hogen*, 2008 SD 96, ¶9, 757 NW2d at 163 (quoting *Maxner v. Maxner*, 2007 SD 30, ¶11, 730 NW2d 619, 622). The trial court did not abuse its discretion when it determined that this evidence was admissible because it had purposes other than proving PP&H or Master Blaster's character, or that any prejudice which may have resulted from the admission of this evidence did not substantially outweigh the probative value.

Prejudicial Error

[¶58.]     Furthermore, even if the evidence was improperly admitted, Master Blaster has failed to meet its burden of establishing prejudicial error.  In another case applying the Rules to civil cases, we said:

> The rulings of the trial court are presumptively correct; *we have no duty to seek reasons to reverse.*  The *party alleging error* must show prejudicial error. . . .  To show such prejudicial error an appellant must establish affirmatively *from the record* that under the evidence the jury might and *probably would have returned a different verdict* if the alleged error had not occurred.

Sander v. Geib, Elston, Frost Professional Ass'n, 506 NW2d 107, 113 (SD 1993) (citations omitted) (emphasis added).

[¶59.]     In its brief to this Court, Master Blaster concedes that under our standard of review evidentiary rulings are only reversible "when error is demonstrated *and* shown to be prejudicial error.  Error is prejudicial when, in all probability it produced some effect upon the final result and affected rights of the party assigning it." (Appellant's brief, p. 25, (citing *Novak*, 2002 SD 162, ¶7, 655 NW2d at 912) (emphasis added)).  Put simply, our review requires a two-step process; first, to determine whether the trial court abused its discretion in making an evidentiary ruling; and second, whether this error was a *prejudicial error* that "in all probability" affected the jury's conclusion.

[¶60.]     The dissent confuses Rule 403 "prejudicial evidence" with the second step of our review, "prejudicial error."  Step one of our review considers the former,

a trial court's abuse of discretion in admitting "prejudicial evidence."[19] Step two considers the latter, the effect the admission of this evidence had on the jury; the *actual* prejudice to the party. These are two separate concepts that the dissent merges in its discussion. *See* Dissent, ¶¶77-78. The dissent states: "Undoubtedly, the prejudice this evidence had on the jury is *inherent* in its very nature." Dissent, ¶78 (emphasis added). According to the dissent's rationale, the error of admission of prejudicial *evidence* alone is sufficient to prove prejudicial *error*, even without a showing of prejudicial *effect*, and requires remand. This "inherent prejudice" has no precedent in our review of evidentiary rulings. The dissent's "inherent prejudice" standard of review requires absolute perfection by trial courts on every evidentiary ruling, by requiring remand on evidentiary errors however slight or inconsequential. Ultimately, the "inherent prejudice" rule emasculates the burden imposed on the challenger in our long-held error *and* prejudice standard of review. We refuse to adopt such a position.

[¶61.] In its briefs and oral argument presented to this Court, Master Blaster does not present *how* or *why* the introduction of this evidence led to a different verdict. Other than positing that it was required to litigate the cause of the 1999 fire and the "inherent prejudice" of the evidence, Master Blaster has made no claim of prejudicial *error*.[20] Master Blaster adds that "[t]he limiting instruction was

---

19. The two step review applies to other potential abuses of discretion in admitting evidence under the Rules, not simply "prejudicial evidence" under Rule 403.

20. Contrary to Master Blaster's assertion, the evidence did not require the jury to consider whether or not PP&H had *caused* the 1999 fire. PP&H's representatives conceded that PP&H was the cause of the fire. Further,

(continued . . .)

insufficient to overcome the temptation to rest liability on admittedly non-causal grounds and the 1999 fire."[21]  This is insufficient to establish "from the record," that the jury "might and probably would have returned a different verdict . . ." in the absence of this testimony, *Sander,* 506 NW2d at 113, or that "*in all probability* [the evidence] produced some *effect* upon the final result. . . ."  (Appellant's brief, p. 25) (emphasis added).  Without such a showing of prejudicial error, we must conclude the disputed evidence was harmless.

[¶62.]      The substantial record before us reflects a significant amount of evidence supporting the jury's findings.  Even though we need not reach the issue of prejudicial error, no such error was demonstrated by Master Blaster.

[¶63.]      **4.     Whether Dr. Schroeder's testimony regarding "pyrolysis" failed to meet the *Daubert v. Merrell Dow Pharmaceuticals, Inc.* standard.**

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

SDCL 19-15-2 (Rule 702).

---

(. . . continued)

> Master Blaster offered a fax received from Ward and Whitemore Universal Fire Consultants that concluded that the vent was installed too close to the rafters, leading to the fire.  The cause of the 1999 fire was undisputed.  The dissent agrees that "the cause of the 1999 fire was not in dispute. . . ." Dissent, ¶75.

21.      Master Blaster wrote the limiting instruction that it argues was insufficient.

[¶64.]    Master Blaster suggests that the trial court abused its discretion by permitting Dr. Schroeder's testimony regarding a "pyrolysis"[22] theory of causation. Master Blaster does not challenge Dr. Schroeder's qualifications as an expert or that scientific knowledge would assist the trier of fact in this case.  Instead, Master Blaster argues that the theory of "pyrolysis" itself is scientifically unreliable and should have been excluded on the authority of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 US 579, 125 LEd2d 469, 113 SCt 2786 (1993).

[¶65.]    In considering *Daubert* challenges, this Court has stated:

> Judges have "considerable leeway" in deciding in each case "how to go about determining whether particular expert testimony is reliable." Although *the standard for reliability is not high*, the goal is to ensure that expert testimony is based on sound methods and valid procedures.

Wells v. Howe Heating & Plumbing, Inc., 2004 SD 37, ¶16, 677 NW2d 586, 592 (emphasis added).

[¶66.]    In this case, Dr. Schroeder provided the trial court with published scientific articles discussing this theory, in addition to his own work experience and research.  Master Blaster's expert witnesses agreed with Dr. Schroeder that the temperatures in the exhaust vent *could* have ignited the cellulose insulation if it

---

22.    The "pyrolysis" theory posits that the ignition temperature of wood and wood products is lower after prolonged exposure to heat.  The generally accepted temperature for ignition is 400°F.  Research indicates ignition can occur when lower temperature heat is applied for a period of time.  There is an ongoing debate in the fire science community regarding the exact temperatures and durations required for this effect to occur.  The existence of this debate was discussed by several of the expert witnesses in depositions. The existence of the debate about pyrolysis pertains more to the *basis* for Dr. Schroeder's expert opinion, rather than the *admissibility* of the theory.  *See First Western Bank Wall v. Olsen*, 2001 SD 16, 621 NW2d 611.

came into contact with the vent. While these experts did not agree that this is what *did* occur, they did not suggest that Dr. Schroeder's theory, as a scientific matter, was without merit. Furthermore, the Consumer Product Safety Commission (CPSC) requires that manufacturers inform installers and consumers of cellulose insulation "of ways to avoid the fire hazard that exists where cellulose insulation is installed . . . too close to the exhaust flues from heat-producing devices or apparatus such as furnaces, water heaters, and space heaters." 16 CFR 1404.1(a). In this case, Dr. Schroeder's theory of ignition is sufficiently reliable to withstand the *Daubert* challenge, whether it was called "pyrolysis" or simply the "fire hazard" recognized by the CPSC and others.

[¶67.] The trial court's conclusion about the reliability of the "pyrolysis" theory is within its "considerable leeway" to admit relevant, reliable scientific testimony.[23] The trial court's conclusion was not an abuse of discretion.

[¶68.] Affirmed.

[¶69.] ZINTER and MEIERHENRY, Justices, concur.

[¶70.] KONENKAMP, Justice, and SABERS, Retired Justice, dissent.

SABERS, Retired Justice (dissenting).

---

23. Master Blaster unavailingly relies on *Truck Ins. Exchange v. MagneTek, Inc.,* 360 F3d 1206 (10thCir 2004). *MagneTek* concerns the low temperature (232°F) ignition of a three inch block of wood in a fluorescent light fixture. This case deals with the ignition of cellulose ignition after prolonged exposure to heat in the 300°F or greater range. While the *MagneTek* decision rejects the "pyrolysis" theory, it has not been followed in any other jurisdiction and is not controlling in South Dakota.

[¶71.]    Because Master Blaster was not afforded a fair trial in this case, I dissent. The trial court abused its discretion by permitting the jury to consider two instances of other acts evidence, which were irrelevant to the claim asserted, were prohibited propensity evidence, and were substantially more prejudicial than probative. Therefore, this case should be remanded to provide Master Blaster with a fair trial on the merits of the negligence claim Supreme Pork lodged against it.

[¶72.]    Irrelevant evidence is inadmissible, while relevant evidence is generally admissible. SDCL 19-12-2 (Rule 402). Evidence is relevant if it has "any tendency to make the existence of *any fact that is of consequence to the determination of the action* more probable or less probable than it would be without the evidence." SDCL 19-12-1 (Rule 401) (emphasis added); *see also* State v. Mattson, 2005 SD 71, ¶19, 698 NW2d 538, 546 ("Relevancy is demonstrated where evidence is necessary to prove an element of the crime, not simply to demonstrate defendant's character."). The trial court permitted other acts evidence relating to two different instances: (1) an alleged code violation of the eighteen-inch clearance required between combustibles and a single wall vent, and (2) evidence of another fire in 1999 at a different location in which it was alleged PP&H was at fault.

[¶73.]    At trial, the issue was whether PP&H's failure to affix attic shields to the attic floor around the chimney vents and to cover the attic shields amounted to negligence for which Master Blaster could be held liable. Whether the alleged code violation of the eighteen-inch clearance caused the fire was not at issue. In fact, Supreme Pork openly agreed that this alleged violation was *not* the cause of the fire. Therefore, this alleged violation was irrelevant to the issue at hand because it was

not a "fact . . . of consequence to the determination of the [negligence] action."
SDCL 19-12-1 (Rule 401).

[¶74.] Supreme Pork argued that this evidence was relevant because it was indicative of PP&H's "overall sloppy workmanship," and if PP&H was "willing to cut corners with respect to the clearances involved between single and double vents, [then it can be assumed that] they're also willing to cut corners with respect to attic shields and their secondary securing of attic shields." It is this propensity argument that is strictly prohibited under evidentiary rules. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." SDCL 19-12-5 (Rule 404(b)). Supreme Pork's argument plainly asserts that PP&H had the propensity to violate the building code. This is not allowed. *See, e.g.,* State v. Lassiter, 2005 SD 8, ¶24, 692 NW2d 171, 179; State v. Christensen, 2003 SD 64, ¶34, 663 NW2d 691, 699 (Sabers, J., concurring in part and dissenting in part); State v. Jolley, 2003 SD 5, ¶34, 656 NW2d 305, 312 (Sabers, J., dissenting); State v. Jones, 2002 SD 153, ¶9, 654 NW2d 817, 819; State v. Wright, 1999 SD 50, ¶14, 593 NW2d 792, 799 ("If the only reason for offering the evidence is to show a defendant's propensity, then it is clearly irrelevant.").

[¶75.] Similarly, the evidence regarding the 1999 fire was not relevant to the instant action. The 1999 fire occurred shortly after construction of the building and was allegedly caused when the vent came in contact with the timbers in the building. The cause of the 1999 fire was not related to a failure to affix shields to the floor around the chimney vent. In fact, the 1999 fire occurred at an entirely

separate location three years earlier under different circumstances. The facts surrounding the 1999 fire could not assist the trier of fact in determining whether the cause of the instant fire was as theorized by Supreme Pork. Although the cause of the 1999 fire was not in dispute, the cause of the current fire certainly was. The only purpose of offering the evidence relating to the 1999 fire was, once again, to improperly demonstrate propensity. But even at an elementary level, the evidence relating to the 1999 fire was irrelevant to the case and should not have been admitted.

[¶76.]    Even if this other act evidence were deemed relevant, it still should not have been admitted. Certainly, evidence of other acts is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." SDCL 19-12-5. However, that evidence is not automatically admissible merely because it relates to one of these factors. Rather, the evidence must satisfy the threshold test of its probative value being substantially outweighed by its unfair prejudice. Indeed, before admitting any such evidence, trial courts are required to perform a balancing analysis on the evidence to determine "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]" SDCL 19-12-3 (Rule 403); *Wright*, 1999 SD 50, at ¶25, 593 NW2d at 803. This balancing requirement is one of the four "safeguards" this Court recognizes to protect parties from unfair prejudice. *Id*. If the prejudice substantially outweighs the probative value, the evidence must be excluded to ensure the defendant receives a fair trial. SDCL 19-12-3 (Rule 403); *see Mattson*, 2005 SD 71, ¶20, 698 NW2d at 546 (citation omitted) ("If other acts

evidence is relevant and offered for a purpose other than to prove character and conformity with that character, it still may be excluded if the probative value of the evidence is substantially outweighed by factors such as unfair prejudice.").  Here, the trial court never performed any balancing analysis on this evidence.[24]  It simply concluded that because the evidence was relevant, it was admissible.

[¶77.]    Supreme Pork contends that the other act evidence is admissible because it proves knowledge.  However, no one can seriously argue that the probative value of this evidence outweighs the unfair prejudice it caused Master Blaster.  "Prejudicial evidence is that which has *the capacity* to persuade the jury by illegitimate means which results in one party having an unfair advantage."  Novak v. McEldowney, 2002 SD 162, ¶11, 655 NW2d 909, 913 (emphasis added).  The admission of evidence relating to the unrelated alleged code violation and the unrelated 1999 fire certainly had the capacity, and most likely the actual effect, of persuading the jury by illegitimate means, thereby giving Supreme Pork an unfair advantage at the trial.

[¶78.]    The majority's opinion claims that "Master Blaster [did] not present [evidence "from the record" demonstrating] *how* or *why* the introduction of this evidence led to a different verdict."  *See supra* ¶61.  At both the suppression hearing and in its brief, Master Blaster explained how this other act evidence was prejudicial evidence that proved nothing but PP&H's propensity to do "sloppy

---

24.    Simply declaring that the evidence is relevant and "probab[ly] going to be . . . substantially more probative than prejudicial," with nothing more, is not a balancing *analysis*, as claimed by the majority.  *See supra* ¶49 n17.

work," and that it only served to confuse the jury. Undoubtedly, the prejudice this evidence had on the jury is inherent in its very nature. To err by admitting evidence of such a prejudicial magnitude, as in this case, is necessarily indicative of prejudicial error. It is unbelievable that this damaging evidence could be considered harmless. Under the conference opinion's guise, admitted evidence will *rarely* be deemed prejudicial on appeal, and when prejudicial, it will still be allowed because the challenger is unable to meet the majority's elusive standard of proof. The perpetuation of the majority's rationale will do nothing but wrongfully deprive defendants of their right to a fair trial.

[¶79.]        Both instances of this evidence were far more prejudicial than probative even when considered alone. When considered together, their prejudice doubly exceeds any probative value. For all these reasons, this case should be reversed and remanded to provide Master Blaster with a fair trial.

[¶80.]        KONENKAMP, Justice, joins this dissent.